**Hugo A. RAMIREZ, M.D.**

v.

**Suzanne AHN, M.D., et al.**

Civ. A. No. 87-1348.

United States District Court,
S.D. Texas,
Houston Division.

Dec. 3, 1987.

Marian Rosen, Robert Newey, Houston, Tex., for plaintiff.

Sedora Jefferson, Lauri J. Schneider, James C. Todd, Paul R. Gavia, Atty. General's Office, Austin, Tex., for defendants.

## ORAL OPINION

HUGHES, District Judge.

Justice Douglas once said that it is not enough to know that the men applying the standard are honorable and devoted men. This is a government of laws and not men.

Most references in people's minds to the word procedure brings out the thought of technicality or artificiality. However, through several hundred years of experience, western civilization has found that by the requirement of procedures, by the specification of processes, the people can discipline power.

It is only by the disciplined exercise of power that those subjected to that power are fairly treated. It is only through some discipline of procedure that they may know the charges against them and be treated as other people similarly situated are treated.

It is not accidental that many of the specific provisions of the original constitu-

tion and the Bill of Rights are procedural. The only way we know when the government is behaving within its limits is when it goes through each step that we require of it. Those are not silly technicalities, but they are the essence of ordered liberty.

█ With respect to the arguments by Dr. Ramirez that the board is unconstitutionally composed, the Court finds that the statutory scheme of the Texas Medical Practices Act is not on its face or as applied from the evidence in this case unconstitutional.

One of the areas of wide latitude is in how the states compose their subordinate units. Deciding that there must be at least three osteopaths and doctors, medical doctors, from good schools, and excluding representation of nurses is not constitutionally objectionable.

It is possible, given the vague term reputable and a couple of the other provisions of the act, that it could be misapplied. There is no evidence in this case of the exclusion of people from the board based on a biased application of those requirements.

The current board is composed of an Asian, Hispanic, a Black, a couple of lay people, some women and some men. The overwhelming majority of the board ethnically are Anglos.

There is nothing under the constitution or in practical reality that suggests that a white may not fairly represent a black, either in Congress or on a city council or on an administrative board. There is no requirement of quotas based on the numbers of doctors or any ideal. The constitution is colorblind and requires that the agencies of the states be colorblind.

Actually the thought that there must be Hispanics to represent Hispanics, women to represent women, and blacks to represent blacks and whites to represent whites is just another pernicious form of racism under a different guise. So the composition of the board in its ethnicity is not constitutionally objectionable.

The data provided the Court in this case on the administrative discrimination, that is the application of the law more harshly to people who belong to categories not generally favored in our society, is mixed.

As I have indicated, in Mr. Mitchell's ten criteria, several of them overlap, so that being foreign born is likely to give you a foreign name and a foreign accent. Whether he is correct that even if it were a single category it should be weighted at 30 percent, that may be correct, but it is difficult to tell that from the evidence the Court had.

There is a category that is missing that was discussed in the earlier hearings, and that was the doctors who generally treat patients of a lower socio-economic level. Even an Anglo male doctor who has an innercity practice might be disadvantaged by the establishment, and that was one of the questions raised at the earlier hearings.

It's not addressed in this evidence and I don't know whether it would have been negatively correlated or positively correlated or indeterminate.

Although the sample size of 23 is all of those class of hearings that there were, given the fact that there are 28,000–some-odd physicians, of whom a significant number are Hispanic, the Court cannot conclude that the administration of the statute under these facts has been ethnically or— I'm not sure I would characterize the category of advertising weight loss clinics as innovative treatment, but peculiar practices perhaps would be an acceptable almost neutral term.

The Court would have to be more ingenious than its experience has allowed to not recognize that the more individualistic any person practicing a profession becomes, the less peer support they have and therefore the more likely they are to be a viscous candidate for sanction.

Without having considerably more evidence about the nature of the complaints against each, the nature of the practices, I am unable on this record to find administrative discrimination.

I do think, as I have indicated, that it is a problem of which the board must be constantly aware, and they should neither tax

society doctors for their prominence and success, nor oddball peculiar doctors for their weirdness, but see that everybody, including the Methodist suburban doctors with three-piece suits and four-door cars, are delivering the medical care they're supposed to.

■ That brings us to the question of the procedural due process that was afforded Dr. Ramirez from the inception. In the beginning, the board opened the file based on a complaint from a competing physician who made economic and social arguments and claimed to have no individual knowledge about Dr. Ramirez in his practice, including with his complaint advertisements for hospitals in Philadelphia, articles in the Houston Chronicle about the procedure, referred to a doctor in Austin as an advertising dermatologist. That is not a compliment.

The second letter, from Dr. Ersek, is as unprofessional as the first one. References to investment schemes. Dr. Ersek referred him to Dr. Cukier, C U K I E R, who it turns out knew more than Dr. Ersek but referred him to Dr. Steven Garren, who apparently had some contact with Dr. Ramirez, but again was mostly interested in the fact that Dr. Ramirez and Dr. Molano had a Colombian connection, the problems of wholesale practicing, and other concerns that seem more economic than medically oriented.

The Court understands that the board apparently did not know of this, but the board is responsible for its investigators. It's responsible for admonishing doctors not to use the board's facilities for revenge or for any competitive purposes.

The next step in the procedure with respect to Dr. Ramirez was the spate of adverse publicity. The Court concludes that it was in fact in response to the media that the board reacted. Responding to knowledge acquired from the press is not a bad thing. Nothing unconstitutional about it. Reacting may be. The need for the emergency session does not appear in the board's records.

The complaint file was opened, as I recall, in November of 1986, investigator dispatched in February, and five interviews had been conducted by early March. It seems to have been ample time to have conducted a thorough investigation in advance, or at least a consultation with Dr. Ramirez.

The Court has before it in the record the fact that Dr. Ramirez offered to cease doing what the offending evidence purported to show he was not doing well. The subject of the complaint was liposuction.

The Court did not mean to minimize by its questioning yesterday about the death of patients. The death of a patient is important whether it's caused by the doctor or not, obviously. It is of importance to the medical board, however, only when the connection between some behavior of the doctor and the cause of death exists. And something other than the fact of death must be established.

The fact of death was very much emphasized in Dr. Viola's judgment. The fact of death was very much minimized in the case of Dr. Wood.

The Court concludes that the Texas Medical Practices Act establishes an executive committee composed of the officers and one or two additional persons, depending on whether the collected officers include an osteopath and a lay person.

The Court would consider an established practice by the medical board of having a committee of a fixed size different from that whose membership they could identify. At the time of Dr. Ramirez' emergency suspension, there were four members of the executive committee: The president, vice-president, secretary-treasurer, and Mr. Crouch. Dr. Williams was the secretary-treasurer.

Dr. Ramirez' suspension hearing was attended by Dr. Hilliard, Ms. Jenkins, and Dr. Williams. No quorum of the statutorily-required committee attended.

If, in the alternative, we accept the argument that Dr. Hilliard and Ms. Jenkins were really added to the committee by some sort of formal identifiable process so some doctor would know when he was be-

ing confronted by a duly constituted tribunal, it would be six members, of whom only three were in attendance.

That is only a secondary suggestion. It is clear to the Court that neither Jenkins nor Hilliard was properly a member of the executive committee.

There was a board meeting between Dr. Godinez' resignation in January and Dr. Ramirez' temporary suspension hearing. At that meeting, the board decided not to hold an election. There was no legal impediment to holding that election, no factual impediment to holding that election.

The fact that they took a vote not to have the election exacerbates the inability to conduct the board in an organized perceptibly orderly fashion.

The addition of Ms. Jenkins to the executive committee, or the attempted addition of her to the executive committee because Mr. Crouch was sick—I guess the fairest thing to say is, as I characterized the action earlier, irresponsibly casual.

The question of the succession of the vice-president to president I don't think needs to be particularly resolved, although it should have been resolved. It seems that Holliday being senior officer could conduct the meetings and carry out a number of the offices.

The Act and the rules and regulations of the board provide that most of the administrative responsibilities rest with the secretary-treasurer. So most of the president's responsibilities discussed in Sturgis could have been carried out under the board's regulations by Dr. Williams.

In the event of emergency, it perhaps would have been acceptable for Holliday to have appointed a hearing examiner, or perhaps it would have been preferable for Holliday and Williams to appoint a hearing examiner, or for the board to pass a resolution appointing a hearing examiner.

The available appropriate procedures are multitudinous. The suggestion that the board was waiting on the governor is a rather infantile attempt to shift the responsibility for operating their own house in an orderly, responsible manner.

Nothing would have prevented the interim election, an election until the appointment, or some other conformity of their behavior with the Act.

The Court concludes as a matter of law that it is not a provision of the bylaws to refer in the rules and regulations to a textbook, however good that textbook may be. On the question of succession, the textbook contains provisions that would have required the board to fill the vacancy by election and not by succession, if they followed the book.

Even if you buy the theory that referring to a book and a rule incorporates every provision of that as a bylaw, they didn't even follow the book they incorporated.

The board has urged that there is authority for the fact that the board does not need to have testimony available to it at the time it reviews the hearing examiner's decision.

The Court tentatively makes the absence of the transcript one ground of its finding of defects in the procedures. We could not find a case, but in post-trial briefing, the board is welcome to find authority for that point.

I understand that nobody expects all 18 members or whatever of the board to read the entire transcript. The question is its availability in case any one of them does or anybody wants to point to part of it in defense of Dr. Ramirez.

Although of course none of the members of the board testified they would rely on it or they would ever do anything that would violate the antitrust laws or discriminate, it is important that the institution not only not do it, but make sure it is seen not to do it.

The reliance by the board on extrinsic evidence alone would denegrate the integrity of their decision. I don't know where the evidence is to support those findings and I don't know whether there is evidence to support those findings, but the adoption by the board in a case under litigation, of findings without any support in the record is reprehensible.

For the board to take the boilerplate from the hearing examiner and add the boilerplate provided by counsel is no different than relying on the advertising stock deal, anti-competitive racial comments in the complaint letter.

If they will rely on findings and adopt them as their findings, evidence that they have never heard nor seen, they then are as likely to rely on cocktail party conversation, professional jealousy, and other inappropriate responses unrelated to the medical care of the people of Texas.

I suspect the answer of the board will be, well, this was a staff mistake. The board cannot blame the staff. The board is responsible for the staff and not vice-versa.

The Court is not—The Court would not be troubled by Dr. Holliday or the executive director appointing the examiner if that were the only error. All institutions make mistakes, including this one.

But the appointment of the hearing examiner inappropriately is one of a long continuous list of avoidable errors. As late as yesterday, for instance, the medical board could have elected a president, but they chose not to do it, possibly on some sort of theory that it would be a confession of weakness or confession of error, which reminds the Court of Edmund Burke's observation of some bureaucrats in England when he said they defend their errors as if they were defending their inheritances.

The Court finds that the monetary damages are essentially indeterminable. The effect on Dr. Ramirez' practice of the events of the last year are unknowable, at least unknown in this evidence. The financial data on the birthing center is insufficient to draw any reliable conclusion.

Given the range of arguments made by both sides from the same figures, there's simply no way this court can make a determination about the damages that he would suffer in the future.

With respect to the recent past, although he has taken no salary, the Court is not convinced that's economic necessity, condition or business. The birthing center is one of the alternative employments of which Dr. Ramirez is capable.

The Court does find that the suspension of his license caused serious and incalculable harm, not only to his professional reputation and practice, but economically to his long-term gains from the practice of his profession or alternative usage of his medical knowledge.

The argument will be made that this court has no business intruding itself into medical decisions, interfering in bureaucratic expertise, and other such characterizations. If they don't want to be in litigation, they need to behave within the law. And although the board was created to protect the people of Texas, it was given a limited charter, and even those limited powers must be exercised under the requirements of the people's constitution.

I will point out that there are similar provisions in the Texas constitution to the due process and equal protection clauses of the United States constitution, the numbers of which I don't remember offhand.

This is not some sort of foreign Federal intrusion. It is an element of regular government, and regularity in government operation is essential to its legitimacy.

And we have an abundance of government in this country and it must follow the law. Actually in the United States there is somewhat in excess of 82,000 units of government. That works out to about one for every 3,200 people, so we're not exactly an under-governed country.

I am going to vacate by my judgment the suspension of Dr. Ramirez' medical license. In fashioning a remedy for the deprivation of his rights to be free from arbitrary government, the Court has to view carefully all of the evidence it has heard in order not to do more harm than good.

In order to fashion as limited and narrow a remedy as the justice of this case requires, the evidence obliges the Court to limit the license of Dr. Ramirez to the practice of medicine of which he is otherwise capable, other than liposuction, and further restriction on the practice of medicine by Dr. Ramirez upon this restoration

is that he may not medically or administratively participate in what we seem to have come to as a generic term, a weight control clinic in which liposuction is done.